IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ANGELA CARRICO, *Individually*
*and as administrator of the Estate*
*on behalf of David Dehmann*

   **Plaintiff,**

               Case No. 2:16-cv-502
               Chief Judge Edmund A. Sargus, Jr.
v.              Magistrate Judge Chelsey M. Vascura

**KNOX COUNTY SHERIFF'S**
**OFFICE,** *et al.*,

   **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' Motion for Summary Judgment (ECF No. 52), Plaintiff's Memorandum in Opposition (ECF No. 62), and Defendants' Reply in Support. (ECF No.64.) For the reasons that follow, Defendants' Motion is **GRANTED in part and DENIED in part.**

### I. BACKGROUND

**A. Procedural Background**

Plaintiff Angela Carrico brings suit individually and as administrator for the Estate of David Levi Dehmann against Defendants[1], the Knox County Sheriff's Office, Knox County, Knox County Sheriff David Shaffer ("Shaffer"), Deputy Chase Wright ("Wright"), Sergeant

---

[1] Plaintiff does not contest Defendants' assertion that the Knox County Sheriff's Office and Sheriff Shaffer should be dismissed as named Defendants. Plaintiff has therefore waived claims against Knox County Sheriff's Office and Sheriff Shaffer. *Haddad v. Sec'y, U.S. Dep't of Homeland Sec.*, 610 F. App'x 567, 568–69 (6th Cir. 2015) ("[A] plaintiff is deemed to have abandoned a claim when [she] fails to address it in response to a motion for summary judgment.") (quoting *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013)).

Alan Hackman ("Hackman"), Deputy Terry Wolfe ("Wolfe"), and Deputy Brianna Copley ("Copley, together "Defendants") alleging use of excessive force in violation of 42 U.S.C. § 1983, as well as failure to intercede, deliberate indifference to Mr. Dehmann's need for medical treatment, ratification, and other state claims for acts that took place while Mr. Dehmann was in custody at the Knox County Jail.

Defendants move for summary judgment on all counts. Plaintiff opposes.

**B. Factual Background**

On April 21, 2015, Corporal Tharp of the Mt. Vernon Police Department arrested David Dehmann for disorderly conduct and transported him to the Knox County Jail. (Compl. ¶¶ 16–18, ECF No. 1.) Mr. Dehmann was intoxicated at the time and unbeknownst to Defendants, was on blood thinning medication. (Wright Decl. ¶ 19.) Following a preliminary examination and the removal of Mr. Dehmann's handcuffs, Sergeant Hackman directed Mr. Dehmann to walk down the intake hallway towards a holding cell. (Wright Decl. ¶ 35, ECF No. 52-1.) Sergeant Hackman and Deputy Wolfe then proceeded to escort Mr. Dehmann down the hall. (Wright Dep. at 9:28–29.) Deputies Copley and Wright were also present in the hallway.

While walking down the hallway, Mr. Dehmann slowed in front of Deputy Wright, pointed his finger in Deputy Wright's face, and said something to him. (Wright Decl. ¶ 38; Defs.' Exhibit C, Intake Video at 8:04:02; Wright Decl. ¶ 38; Copley Decl. ¶ 17; Wolfe Decl. ¶ 27). Deputy Wright swatted Mr. Dehmann's hand away and told Mr. Dehmann not to point at him. (Wright Decl. ¶ 39); (Defs.' Exhibit C, Intake Video at 8:04:03; Copley Decl. ¶ 18; Wolfe Decl. ¶ 28.) Deputy Wright testified that in response Mr. Dehmann stated, "[o]h you want to fight me" and as illustrated in the image captured by the intake camera, moved into a "fighting stance." (Wright Decl. ¶ 40); Defs.' Exhibit C, Intake Video at 8:04:03.) Mr. Dehmann then

2

swung at Deputy Wright. (Defs.' Exhibit C, Intake Video at 8:04:05.) Deputy Wright avoided being struck by Mr. Dehmann.[2] (Wright Decl. ¶ 42.) He describes that he sidestepped Mr. Dehmann's "swing" and then "moved towards Dehmann (closing the gap). I got my right arm underneath his right arm and around Dehmann's chest. I positioned my body up against Dehmann's body and took Mr. Dehmann down to the floor." (*Id.* ¶ 43.) Deputy Wright testified that Mr. Dehmann's body landed on top of his, but Mr. Dehmann's head struck the floor. A review of the video shows Deputy Wright lifting Mr. Dehmann off the ground before taking him to the floor, where it appears he hit head first. (Defs.' Exhibit C, Intake Video at 8:04:03.) Mr. Dehmann lost consciousness briefly after the takedown. (Hackman Decl. ¶ 29–30); (Copley Decl. ¶ 20.) Defendants then placed a towel under Mr. Dehmann's head to stop the bleeding, retrieved smelling salts to improve his level of consciousness, and called for an ambulance. The call for the ambulance took place less than two minutes after the takedown. (Defs.' Exhibit 8.) The paramedics arrived around 8:16 PM, within twelve minutes of the call. (*Id.*) Mr. Dehmann was checked into the hospital around 8:47 PM. (McCann Dep. 18:19–22.)

Doctors examined Mr. Dehmann at the emergency room and determined that he suffered a contusion to the left frontal parietal area of his head. (McCann Dep. 16:12–21.) Because the hospital he was initially transported to had no neurosurgical coverage, Mr. Dehmann was flown to Grant Hospital in Columbus, Ohio. (McCann Dep. 19:3–18.) Three days after the incident, he passed away.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[2] Only a few seconds elapsed from the time Dehmann pointed his finger at Wright to when he took a swing at Wright. (Wright Decl. ¶ 45; Defs.' Exhibit C, Intake Video.)

3

56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

### III. LAW AND ANALYSIS

Plaintiff brings forth a number of constitutional claims under § 1983 to which Defendants assert qualified immunity. "In § 1983 constitutional torts like this one, qualified immunity

4

prevents government officials from being held liable if (1) the officers did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not 'clearly established' at the time of the alleged misconduct." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The defense of qualified immunity "ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citation omitted). When qualified immunity is asserted, the plaintiff bears the burden of showing that defendants are not entitled to the defense. *Id.* (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)).

## A. Excessive Force

Plaintiff brings a claim for use of excessive force against Deputy Wright in violation of the Fourth Amendment. Plaintiff's claim as a pretrial detainee[3], however, is governed by the Fourteenth Amendment's Due Process Clause. *Ayala-Rosales v. Teal*, 659 Fed. Appx. 316, 319 (6th Cir. 2016) (citing *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015)); *see also Leary v. Livingston City.*, 528 F.3d 438, 443 (6th Cir. 2008) (explaining that pretrial detainees bring excessive-force claims under the Fourteenth Amendment Due Process clause, whereas, "convicted prisoners may bring excessive-force claims under the Eighth Amendment . . . and 'free citizen[s]' may bring such claims under the Fourth Amendment."). Accordingly, the claim

---

[3] Mr. Dehmann had been arrested and was in police custody, but had not been convicted of a crime at the time of the incident making him a pretrial detainee. *Bell v. Wolfish*, 441 U.S. 520, 523 (1979) (holding a pretrial detainee is a person who has been charged with a crime but who has not yet been tried on the charge, and who is legitimately incarcerated prior to the determination of guilt or innocence.). Plaintiff contests whether Mr. Dehmann was indeed a pretrial detainee because he had not yet appeared for arraignment. Mr. Dehmann will be referred to as a pretrial detainee because he was in custody at the Knox County Jail at the time of the incident and the same objectively reasonable test would be applied whether the incident took place during arrest or as a pretrial detainee since *Kingsley*. *Kingsley*, 135 S. Ct. at 2473.

5

will be examined under the Fourteenth Amendment, although this differentiation is insignificant as the Supreme Court's decision in *Kingsley*, held that "a pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment. *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015).

To establish a Fourteenth Amendment excessive-force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473. To determine the objective reasonableness of a Defendant's conduct, the Supreme Court provided a non-exhaustive list of considerations including: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; and effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Recognizing that "[o]fficers facing disturbances 'are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving . . . [the] court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer." *Id.* at 2474. (internal citations and quotations omitted). The objective reasonableness analysis gives deference to the "policies and practices needed to maintain order and institutional security . . . ." *Id.* The test is "reasonableness at the moment" force is used, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

The *Kingsley* decision directs the Court to review a plethora of factors to determine whether the Defendant's actions were objectively reasonable. Plaintiff asserts that Deputy

6

Wright's act in utilizing the takedown method was objectively unreasonable to begin with and even if it was reasonable to perform a takedown of Mr. Dehmann, Deputy Wright used an excessive amount of force.

## 1. Constitutional Guarantees

### a. Use of the Takedown Method On Mr. Dehman

Considering the *Kingsley* factors and construing the facts in a light most favorable to the Plaintiff, there is no evidence from which a reasonable jury could conclude that Deputy Wright used excessive force in performing a takedown maneuver on Mr. Dehmann. Even acknowledging that the performed takedown maneuver resulted in the worst possible injury, the Court concludes that Deputy Wright reasonably perceived Mr. Dehmann as a threat to his safety and rationally utilized the technique to subdue him.

Plaintiff objects to Deputy Wright's use of a takedown, arguing that he should have used a verbal de-escalation technique. The objective reasonableness analysis, however, is not a best approach test. Rather, it measures the force used and whether it was reasonable in the moment from the perspective of a reasonable officer. *Graham*, 490 U.S. at 396 (defendant's action should be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 643 (6th Cir. 2015) ("When a person resists arrest—say, by swinging his arms in the officer's direction—the officers can use the amount of force necessary to ensure submission."). Here, the issue is whether Deputy Wright was within the constitutional bounds to perform a takedown of Mr. Dehmann. Accordingly, whether a verbal de-escalation method would have been appropriate is not relevant

to whether use the takedown method was excessive.[4] *See Wallace v. City of Shelby*, 968 F. Supp. 1204, 1211 (N.D. Ohio 1997) (finding no excessive force where officer defendant performed a takedown maneuver on plaintiff who resisted having her hands cuffed.)

It is further undisputed that the entire interaction between Deputy Wright and Mr. Dehmann lasted, at most, five seconds. (Defs.' Exhibit C, Intake Video at 8:04:03–8:04:07.) Deputy Wright had mere seconds to react to Mr. Dehmann's aggressive invasion of his personal space[5] before Mr. Dehmann could possibly try again. It was objectively reasonable for Deputy Wright to believe Mr. Dehmann would attempt to come at him again, and thus, understandable that Deputy Wright sought to physically subdue him. *A.T. v. City of Columbus*, Case No. 2:06-cv-802, 2008 U.S. Dist. LEXIS 70905, at *14 (S.D. Ohio Sep. 18, 2008) ("It was therefore reasonable for [defendant officer] to employ a standard arm-bar take down technique to bring [plaintiff] to the ground so he could be restrained and prevented from harming anyone else.") (citing *Lane v. Cole*, Case No. 2:03-cv-10148, 2005 U.S. Dist. LEXIS 26102, at *18 (S.D. Ohio Oct. 31, 2005) (finding reasonable officer's use of an arm bar take down after his verbal commands were ignored and a threat of violence existed.)).

Accordingly, the Court finds Deputy Wright was objectively reasonable in his decision to perform a takedown and subdue Mr. Dehmann.

### b. Quantum of Force

The Court now turns to the quantum of force Deputy Wright used when performing the takedown of Mr. Dehmann. Video footage of the incident shows Deputy Wright wrapping his

---

[4] Indeed, based on the Mr. Dehmann's actions and the brief nature of the incident, Deputy Wright would not have had time to utilize a verbal de-escalation method. (Defs.' Exhibit C, Intake Video at 8:04:03–8:04:07.)

[5] The Defendants characterize Mr. Dehmann's movements towards Deputy Wright as swinging at Deputy Wright. The Court's review of the intake video, however, shows Mr. Dehmann moving toward Deputy Wright with his arm flailing.

8

arm around Mr. Dehmann, lifting him off the ground and then slamming him to the vinyl floor head first. (Defs.' Exhibit C, Intake Video at 8:04:07.)

The incident took place in a relatively small hallway of the Knox County Jail where at least two deputies were within close range. *Herring v. Lacy*, No. 95-3535, 1996 U.S. App. LEXIS 8252, at *24 (6th Cir. Mar. 11, 1996) ("the population of a typical police station disproportionately contains better trained, better armed and more vigilant persons," such that the constitutional degree of force properly used may be lower than in public.) Defendants' expert testified that in performing the takedown, Deputy Wright acted in a manner supported by best practices to defend himself. (Caruso Expert Report ¶ 50.) Plaintiff asserts, in contrast, that Deputy Wright's act in lifting Mr. Dehmann off the ground before slamming him down head first was excessive, and ultimately resulted in Mr. Dehmann's death. The floor on which Mr. Dehmann was slammed is seen on the video as hard vinyl floor covering.

When considering the factors as a whole including: Mr. Dehmann's intoxication and effect of that intoxication on his mobility; the hard tile floor; the number of deputies present and within reach; Deputy Wright's size as compared to Mr. Dehmann's; that the Officers arrested Mr. Dehmann for a misdemeanor offense; and that Mr. Dehmann's head hit the ground first, a reasonable jury could find the force used by Deputy Wright was excessive in proportion to the threat Mr. Dehmann posed. *See Goodrick v. Everett*, 193 F. App'x 551, 557 (6th Cir. 2006) (noting "[c]learly, some force may be wildly disproportionate . . . and may constitute excessive force regardless of whether a suspect has already been subdued."); *see also, Leary v. City of Pontia*c, Case No. 06-cv-11029, 2008 U.S. Dist. LEXIS 19962, at *9 (E.D. Mich. March 14, 2008) (finding genuine issue of material fact regarding the alleged use of excessive force where Court noted plaintiff resisted defendants' efforts to handcuff him, but was "unarmed, visibly

9

inebriated and disoriented, and although persistent, [his resistance] was limited primarily to pushing and pulling to keep his hands away from [the officers]." It also observed defendants "were only attempting to effect a misdemeanor arrest" and concluded "jurors could disagree regarding whether defendants' eventual response with their fists and nightsticks was proportional to his resistance, and therefore, reasonable").

The Court has already found Deputy Wright's conduct in performing a takedown of Mr. Dehmann protected under qualified immunity. It is not that all takedown maneuvers are excessive to subdue a volatile pretrial detainee. Rather, it is the unreasonable degree of force in which Deputy Wright performed the takedown that transforms his actions from protected to potentially not. Thus, the Court finds a genuine dispute of material fact as to whether Deputy Wright violated Mr. Dehmann's constitutional right.

### 2. Violation of Clearly Established Law

Having determined that the evidence as to whether Deputy Wright used excessive force presents sufficient disagreement for the existence of a genuine issue of material fact, the Court turns to the second step of the qualified immunity analysis, which considers whether the constitutional right against gratuitous force was clearly established. A right is clearly established for qualified immunity purposes if "the contours of the right at issue have been made sufficiently clear to give a reasonable official fair warning that the conduct at issue was unconstitutional." *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015). "[W]hile a right may not be 'clearly established' at a 'high level of generality' or by broad historical assertions, neither must the specific conduct at issue have been found unconstitutional for a reasonable officer to be on notice that the conduct is unconstitutional." *Id.* at 615–16. That is, fair warning does not require "a [prior] case directly on point" or even a prior case that is "fundamentally" or "materially"

similar to the present case, as such a rule "would be too rigid an application of the clearly established inquiry." *Id.* at 613 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The Court finds that at the time of the incident, Mr. Dehmann had a clearly established right to be free from gratuitous force and that a reasonable deputy would be aware of such right. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 955 (holding "[t]he quantum of force the officers used was constitutionally excessive, violating the Fourth Amendment right of an unarmed, minimally threatening, and mentally unstable individual to be free from gratuitous violence during an arrest."); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 897–98 (6th Cir. 2004) (finding it excessive for police officers to "lay on top of" an arrestee' who had stopped resisting arrest and posed no flight risk, and [then] spray[] him with pepper spray even after he was immobilized by handcuffs and a hobbling device.").

Here, while Deputy Wright did not use continued force to subdue Mr. Dehmann as the officers did in *Martin* and *Champion*, the quantum of force used against Mr. Dehmann was sufficiently severe to raise a genuine issue of material fact as to whether excessive force was used. To begin with, the danger Mr. Dehmann presented was significantly less than the plaintiffs in both *Martin* and *Champion*. In *Martin*, the police were reacting to a situation where the decedent was in public and presented a potential threat, particularly to his neighbor whose house he attempted to break into. Likewise in *Champion*, where the Court found officers used excessive force, the caretaker of a severely autistic man lost control over him while in public and called the police for help. When officers arrived, Champion was exhibiting agitated behavior such as "hitting and biting himself." All of the actions took place in public in front of a Babies 'R' Us store. The events here, as in *Herring*, occurred while Mr. Dehmann was in the hallway of

11

the Knox County Jail surrounded by four deputies. In *Herring* the Court put officers on notice that, "the constitutional quantum of force properly used in the police station might actually be lower" that in a public space such as a "crowded street corner." Case No. 95-3535, 1996 U.S. App. LEXIS 8252, at *23–24.

Under the circumstances of this case, a reasonable officer would have known that utilizing a gratuitous amount of force against a minimally threatening arrestee such as Mr. Dehmann would violate Mr. Dehmann's Constitutional rights. Mr. Dehmann was unarmed. After patting him down, the deputies removed Mr. Dehmann's cuffs due to his compliance with the officers and because he was not perceived as a danger. (Hackman Aff. ¶¶ 19–22.) Moreover, the severity of the crime at issue was minimal as Mr. Dehmann's was arrested for public intoxication, a misdemeanor.

Indeed, the intake vide shows Mr. Dehmann stumbling down the hallway due to his intoxication. Thus, although Mr. Dehmann invaded Deputy Wright's personal space by swatting at him, he did not present such a tenable threat to proportionally necessitate the violent force used to take him down to the ground head first. A reasonable officer in Deputy Wright's position would have known based on clearly established law that it was excessive to violently take down an individual in custody headfirst onto the vinyl flooring under these same circumstances. *See, Myres v. Hooton*, Case No. 1:03-cv-104, 2005 U.S. Dist. LEXIS 6981, at *15 (E.D. Tenn. Mar. 11, 2005) (finding the officer used excessive force against plaintiff Myres "by beating Myres with his fists [] and club before and after subduing Myres."); *Solomon v. Auburn Hills Police Dep't.*, 389 F.3d 167, 174 (6th Cir. 2004) (affirming denial of qualified immunity where woman arrested for trespassing in movie theater kicked in legs and thrown against display case despite minor offense, posing no immediate threat, and not attempting to

flee); *Burden v. Carroll*, 108 F. App'x. 291, 293–94 (6th Cir. 2004) (affirming denial of qualified immunity where officer pushed belligerent suspect against brick wall after suspect had reportedly threatened someone, holding "no reasonable officer could have concluded that it was lawful to violently shove Burden in the manner he describes."); *Bass v. Robinson*, 167 F.3d 1041, 1046–47 (6th Cir. 1999) (reversing summary judgment for officer on excessive force claim where officer allegedly slammed suspect's head against tree after drug sale and during arrest).

Accordingly, because the Court finds a question of fact as to whether the degree of force used in performing the takedown was excessive, and clear authority establishing the unconstitutionality of using gratuitous force to takedown a detainee, Deputy Wright is not entitled to qualified immunity. Therefore, Deputy Wright's Motion for Summary Judgment on for excessive force is **DENIED**.

## B. Failure to Intercede

Plaintiff brings claims against Deputies Hackman, Wolfe, and Copley for failure to intercede. An officer may be held liable for failure to intervene in the face of excessive force when "(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Cole v. City of Dearborn*, 448 F. App'x 571, 577 (6th Cir. 2011) (quoting *Turner v. Scott*, 119 F.3d 425, (6th Cir. 1997).

Plaintiff presents no evidence that Defendants had any knowledge of impending excessive force or opportunity or means to intervene.

It remains undisputed that the entire incident lasted less than five seconds and that Deputy Wright performed a takedown of Mr. Dehmann within two seconds of Mr. Dehman attempting to assault him. Plaintiff argues that after Mr. Dehmann pointed his finger in Deputy

13

Wright's face the other deputies had reason to know excessive force would be used. This incident, however, did not put the deputies on notice that the situation would escalate, nevertheless that excessive force would be used. Rather, at that point in time Deputy Wright swatted Mr. Dehmann's hand out of his face and warned him not to act in a threatening manner. It was not until Mr. Dehmann took a fighting stance and then swung at Deputy Wright that the situation escalated. This is unlike the case Plaintiff cites in support of her argument, *Bland v. Dush*, where an officer watched and did not intervene as other officers struck an 80 year old to the ground, delivered "a series of gratuitous blows" while he lay on the ground, handcuffed him, and then proceeded to warn that they were going to tase him – before actually tasing him. Case No. 10-cv-11046, 2011 U.S. Dist. LEXIS 22029, at *20 (E.D. Mich. March 4, 2011).

According to the video, the deputies did not have the opportunity or means to intercede. (Defs.' Exhibit C, Intake Video at 8:04:03–8:04:07.) Once the situation escalated, both deputies within arm distance ran towards Deputy Wright. The takedown happened so quickly, however, that although the deputies moved toward Deputy Wright and Mr. Dehmann, by the time they reached them, Mr. Dehmann was on the ground. Accordingly, Defendants did not fail to intercede. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim of failure to intercede.

### C. Ratification

Plaintiff also alleges that Knox County is liable under § 1983 for Deputy Wright's conduct under a theory of ratification for failure to investigate. A municipality may ratify its employees' acts — thereby subjecting itself to § 1983 liability-by failing to meaningfully investigate those acts. *Wright v. City of Canton*, 138 F. Supp. 2d 955, 966 (N.D. Ohio 2001); *see Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246-48 (6th Cir. 1989); *Marchese v. Lucas*, 758

F.2d 181, 188 (6th Cir. 1985). An inadequate investigation alone, however, is insufficient to impute liability on Knox County. "[T]here must be not only an inadequate investigation in this instance, but also (1) a clear and persistent pattern of violations; (2) notice or constructive notice thereof; (3) tacit approval of unconstitutional conduct so as to constitute deliberate indifference; and (4) a direct causal link to the constitutional deprivation." *David v. City of Bellevue*, Case No. 16-3754, 2017 U.S. App. LEXIS 16325, at *14 (6th Cir. Aug. 24, 2017) (citing *Doe v. Claiborne Cnty.*, 103 F.3d 494, 508 (6th Cir. 1996)).

Viewed in this light, evidence that a municipality inadequately investigated an alleged constitutional violation can be seen as evidence of a policy that would condone the conduct at issue. Plaintiff argues Knox County ratified Deputy Wright's behavior because the investigation only included a review of the video. A review panel consisting of Sheriff Shaffer, Captain Jay Sheffer, the jail administrator Lieutenant Penny Lamp, and Sergeant Shaffer reviewed the video of the incident and jail policy and procedure. (Shaffer Decl. ¶¶ 19, 20.) The panel concluded that Deputy Wright acted according to policies but nevertheless recommended future training for all officers. (Decl. Shaffer, Exhibit E at ECF 52-7.) Plaintiff asserts that those individuals should have interviewed witnesses and reviewed any written statements, the coroner's report or any medical records to satisfactorily investigate the incident. Plaintiff, however, provides no evidence to support a pattern of violations, notice or constructive notice of those violations, any approval of those violations, or a causal link to the alleged deprivation here. *David*, 2017 U.S. App. LEXIS 16325, at *15 ("Absent evidence of a pattern of violations, there is no demonstration of causation to show that the allegedly inadequate investigation caused the constitutional violation in question here.").

Moreover, not one but two investigations were performed. Defendants assert that after the incident Knox County contacted the Ohio Attorney General's Office, Bureau of Criminal Investigation to perform an independent criminal investigation. Sheriff Shaffer explained that "an independent expert hired by the Prosecuting Attorney of Knox County as part of the criminal investigation found that Deputy Wright acted reasonably under the circumstances." (Shaffer Decl. ¶ 20.) Accordingly, Knox County is entitled to summary judgment on Plaintiff's ratification claim.

**D. Deliberate Indifference to Medical Needs**

Finally, Plaintiff asserts a claim for deliberate indifference to Mr. Dehmann's medical needs. "[I]n the context of pretrial detention, the fault requirement for a due process violation may be satisfied by showing that state officials were deliberately indifferent to the basic medical needs of detainess." *Kulpa v. Cantea*, Case No. 16-cv-2521, 2017 U.S. App. LEXIS 17326, at *19 (6th Cir. Sept. 6, 2017) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002)). "Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to the pretrial detainee's health and safety." *Id.* (citing *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005). To establish a violation for deliberate indifference, the plaintiff must satisfy an objective and subjective component. *Baynes v. Cleland*, 799 F.3d 600, 618 (6th Cir. 2015). The objective component requires the existence of a "sufficiently serious" medical need. *Smith v. Cnty. of Lenawee*, 505 F. App'x 526, 533 (6th Cir. 2012) (citation omitted). To establish the subjective component the plaintiff must show defendants had a sufficiently culpable state of mind in denying medical care. *Id.*

Even a relatively short time lapse in time between injury and treatment can amount to deliberate indifference. *See Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 601, 603 (6th

Cir. 2005) (denying qualified immunity to officers who, after severely beating a suspect, locked him in the back of a police cruiser and waited six minutes before calling for medical assistance, during which they greeted each other, prepared for their superiors' arrival, adjusted their uniforms and discussed the severity of the victim's injuries). Deliberate indifference, however, "is not mere negligence." *Smith*, 505 F. App'x at 533 (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001)).

The parties do not dispute Mr. Dehmann suffered an objectively severe injury. Plaintiff alleges Defendants acted with deliberate indifference to Mr. Dehmann's needs by delaying treatment. First, because Defendants "waited at least two minutes to call for an ambulance" and second, based on the length of time took to transport Mr. Dehmann to the hospital from the Knox County Jail.

Defendant Wright utilized the takedown of Mr. Dehmann at 8:04:07. (Defs.' Exhibit C, Intake Video at 8:04:07.) Sergeant Tharp called for an ambulance around 8:06 and around 8:15:52 the ambulance arrived. (Defs.' Exhibit C, Sally Port Video at 8:15:52.) Sergeant Hackman testified that he was about ten to fifteen feet away from Deputy Wright and Mr. Dehmann when the takedown took place. He testified that he immediately went to assist and notice that Mr. Dehmann was unconscious and that a small amount of blood came from the back of Mr. Dehmann's head. (Hackman Decl. ¶ 29.) Sergeant Hackman was aware that Corporal Tharp contacted the Mount Vernon Fire Department for medical assistance within two minutes of the incident and in the meantime he directed Deputy Copley to retrieve towels to help control the bleeding, applied the towels to the wound, and "tried to keep Mr. Dehmann calm and still because Mr. Dehmann was attempting to sit up. I told Mr. Dehmann that medics were on the way." (Hackman Decl. ¶¶ 31–33.)

Deputy Copley testified that upon noticing that Mr. Dehmann was unconscious and bleeding, "Sgt. Hackman immediately began first aid. Cpl. Tharp called for an ambulance. I retrieved a towel to put under Mr. Dehmann's head to stop the bleeding. Sgt. Hackman stayed with Mr. Dehmann until medics arrived." (Copley. Decl. ¶¶ 19–22.) Meanwhile, Deputy Wolfe testified that he did not know Mr. Dehmann was injured so he initially went to get a restraint chair "because I had just witnessed Mr. Dehmann attempt to assault a deputy and I thought we might need the restraint chair to calm Mr. Dehmann down." (Wolfe Decl. ¶ 32.) Deputies never put Mr. Dehmann in the restraint chair. After realizing Mr. Dehmann suffered an injury, Deputy Wolfe retrieved smelling salts to improve Mr. Dehmann's level of consciousness. (Wolfe Decl. ¶ 33.)

It is undisputed that there was a delay of about two minutes between the incident and call for medical assistance. (Defs.' Exhibit C, Intake Video at 8:04:03 and 8:06.) Defendants account for the delay as they assessed the situation, divided up tasks, and administered first aid. (Hackman Decl. ¶¶ 19–22.) Even viewing the facts in the light most favorable to Plaintiff, the short delay carries no malintent and does not amount to more than potential negligence. Because negligence is not deliberate indifference, Plaintiff's first claim is not well taken.

Plaintiff also asserts Mr. Dehmann's transportation to the hospital was delayed for forty-three minutes. (Pl.'s Brief at 20.) Any delay in transporting Mr. Dehmann to the hospital, however, is not the fault of the Defendants. Paramedics arrived at the Knox County Jail at 8:16:03, roughly ten minutes after Sergeant Tharp called for medical assistance and twelve minutes after the incident. (Defs.' Exhibit C, Intake Video at 8:16:03.) The paramedics then spent about three minutes inside the Knox County Jail, and can be seen in the video carefully

putting Mr. Dehmann on a stretcher.[6] The paramedics then wheeled Mr. Dehmann outside to the ambulance, which can be seen driving away at 8:23:59, less than eight minutes after arriving. (Defs.' Exhibit C, Intake Video at 8:23:59.) According to the paramedic's report, Mr. Dehmann arrived at the hospital at 8:28 PM, approximately twenty-two minutes after the incident. (Defs.' Exhibit 10.) Whether Mr. Dehmann arrived at the hospital forty-three minutes after the incident or twenty-two minutes is irrelevant here as it is clear paramedics were in and out within eight minutes of arriving at the Knox County Jail and any delay that arguably took place pertains to the paramedics, not any of the named Defendants. Accordingly, judgment for Defendants is **GRANTED**.

### E. Remaining State Law Claims

Plaintiff brings state law claims against the Knox County Sheriff's Office and Knox County, all defendants against whom summary judgment has been granted. The Court's grant of summary judgment for those Defendants on the § 1983 claims leaves before the Court only Plaintiff's state law claims for negligent and reckless hiring, retention, or supervision against Knox County and the Knox County Sheriff's Office. Where, as here, a district court has dismissed all of the claims over which it had original jurisdiction, the court may decline to exercise supplemental jurisdiction over the remaining claims. *See* 28 U.S.C. § 1367(c)(3). The decision whether to exercise supplemental jurisdiction over a claim is purely discretionary and depends on judicial economy, convenience, fairness, and comity. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d

---

[6] Plaintiff argues Defendants delayed the paramedics from transporting Mr. Dehmann to secure him. At 8:19:22, the first time Mr. Dehmann's upper body reappears in the video since the incident and about three minutes after the paramedics arrived, it is apparent that he has already been secured. (Defs.' Exhibit C, Intake Video at 8:19:22.) Accordingly, there is no dispute of fact that Defendants did not delay the transport of Mr. Dehmann to the hospital in order to secure him.

19

1244, 1254 (6th Cir. 1996). As a rule of thumb though, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc.*, 89 F.3d at 1254–55.

After analyzing the relevant considerations, the Court concludes that it will decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. The case has not proceeded to trial yet. Moreover, this case implicates questions of Ohio, not federal, law. These issues as well as the other state law issues are best resolved by an Ohio court.

Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, the parties' motion for summary judgment on those claims are **DENIED** as moot.

## IV. CONCLUSION

For these reasons, Defendants' Motion for Summary Judgment (ECF No. 52) is **GRANTED IN PART and DENIED IN PART**. Plaintiff's remaining state law claims are **DISMISSED** without prejudice.

**IT IS SO ORDERED.**

6-28-2018
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**